Myron ASH, as trustee of the J & W Corporation Liquidating Trust, Plaintiff–Appellant,

v.

Donald E. WALLENMEYER, et al., Defendants–Appellees.

No. 88–1253.

United States Court of Appeals, Seventh Circuit.

Argued March 29, 1989.

Decided July 13, 1989.

Rehearing Denied Aug. 3, 1989.

Nicholas P. Iavarone, Bellows & Bellows, Michael J. Carey, Chicago, Ill., for plaintiff-appellant.

Garrett B. Johnson, Kirkland & Ellis, Randall A. Hack, B. John Mix, Jr., Chicago, Ill., Donald E. Wallenmeyer, Orland Hills, Ill., for defendants-appellees.

Before POSNER, FLAUM, and RIPPLE, Circuit Judges.

POSNER, Circuit Judge.

This appeal by a disappointed plaintiff illustrates the potential conflict between adversarial and substantive justice. The plaintiff, Myron Ash, is the former president and principal owner, and the present trustee in bankruptcy, of the J & W Corporation, a motor common carrier with headquarters in Chicago. One of J & W's customers was a facility in Gary, Indiana, owned by Georgia–Pacific Corporation, the paper producer, which is a defendant in this case along with Raymond Iverson and Chester Adamczyk, respectively the traffic and plant managers of the Gary facility. In 1980 Ash decided to expand J & W's business and specifically to try to get more business from the Gary facility. To this end he hired Donald Wallenmeyer (another defendant), who was experienced in obtaining ICC approval of routes and rates. Through Wallenmeyer, J & W successfully applied to the ICC for authority to carry paper products interstate.

Because of his wife's chronic illness, Ash moved to Florida in 1982, leaving Wallenmeyer in charge of J & W. With the cat away, the mice began to play. Wallenmeyer created S.M.F. Lines, Inc. (another defendant) and with Iverson's connivance submitted freight bills on behalf of S.M.F. to Georgia–Pacific for work done by J & W. In addition, although Wallenmeyer had promised Ash to enroll J & W in an ICC-approved freight bureau and charge Georgia–Pacific the tariffed rates set by the bureau, he did not enroll J & W in the freight bureau and he charged Georgia–Pacific rates far below the tariff level. By carrying freight for Georgia–Pacific at discount rates, Wallenmeyer made Iverson and Adamczyk look good to their superiors; the quid for this quo was the siphoning of payments due J & W to Wallenmeyer's phony corporation, S.M.F.

In 1984 Ash discovered the part of the fraud involving S.M.F. (that is, the diversion of Georgia–Pacific freight business from J & W, as distinct from the charging on J & W's behalf of bargain rates to Georgia–Pacific), and he filed this suit in 1985. It was only in the course of pretrial discovery that Ash learned of the other part of the fraud, the unauthorized sale of J & W services to Georgia–Pacific at below-tariff rates. Ash was able to document only $12,000 in J & W revenues diverted to S.M.F., but the pretrial discovery revealed that as a result of Wallenmeyer's failing to charge tariff rates J & W had underbilled Georgia–Pacific by $137,000.

On the eve of trial, the district judge ruled that Ash could not obtain damages on the underbilling from Georgia–Pacific, Iverson, or Adamczyk, but could from Wallenmeyer and S.M.F.—although only because these two had defaulted. The default judgments were worthless, Wallenmeyer being an assetless bankrupt and S.M.F. what the Germans call an *ausgeblasenes Ei* (an eggshell from which the contents have been sucked out through a hole). Ash didn't want to pursue a lawsuit for

$12,000—his attorney's fees would greatly exceed that amount—so he requested the judge to dismiss the case with prejudice, which the judge did, and Ash appeals.

The defendants question the propriety of Ash's appealing from a judgment that he himself asked the judge to enter. But they misconstrue the nature of the appeal. Ash wanted to appeal from the ruling that he could not obtain underbilling damages—the principal damages he sought—from any of the solvent defendants. Had he prosecuted the case to judgment and won $12,000, he could have appealed, claiming that the damages were inadequate and that the ruling excluding the underbilling damages should be reversed. See, e.g., *Disher v. Information Resources, Inc.,* 873 F.2d 136, 138–39 (7th Cir.1989); *LaBuhn v. Bulkmatic Transport Co.,* 865 F.2d 119, 121–22 (7th Cir.1988). He took a proper shortcut. *United States v. Procter & Gamble Co.,* 356 U.S. 677, 680–81, 78 S.Ct. 983, 985–86, 2 L.Ed.2d 1077 (1958). If he had taken the longer route and lost on appeal, he would have wasted everyone's time with a futile trial; if he had taken the longer route and won, then it would have taken two trials to give him the relief he deserved. He should not be penalized for trying to save everyone time and money.

The ruling that he seeks to challenge came in response to (1) the defendants' insistence that Ash should have moved to amend his complaint as soon as he realized there were potential underbilling damages as well as the diversion damages specified in the complaint, and (2) Ash's concession during discovery that "this is not a rate case," although the underbilling damages that he seeks are the difference between the tariffed rates for the shipments in question and the lower rates that Wallenmeyer actually charged Georgia–Pacific. Neither point justified the district judge's refusing to allow Ash to pursue the major element of his case and the only one worth the costs of trial. The complaint does specify diversion damages based on Wallenmeyer's shenanigans with S.M.F. but in addition and repeatedly asks for "an accounting for all services rendered to Georgia Pacific by J & W, Wallenmeyer and S.M.F." plus "compensatory damages in the amount determined by reason of the foregoing accounting" plus "such other and further relief as the Court and jury deem appropriate." The regime created by the Federal Rules of Civil Procedure is one of notice pleading, and the passages we have just quoted from the complaint gave the defendants notice enough that Ash was not confining his damages claim to the diversion of business to S.M.F. Hence there was no occasion for him to move to amend the complaint when discovery—specifically an audit of J & W freight bills in Georgia–Pacific's possession (J & W's own records having been destroyed in a fire)—revealed that the damages resulting from the alleged fraud of Wallenmeyer and the managers in the Gary facility of Georgia–Pacific went beyond the diversion of business to S.M.F. The federal rules do not contemplate that parties will amend their pleadings to reflect new information obtained in the discovery process. The information is to be reflected in the framing of issues in the pretrial order, which supersedes the complaint. See *Erff v. Markhon Industries, Inc.,* 781 F.2d 613, 617 (7th Cir.1986).

Granted, there was no pretrial order here, and, as we shall see, the omission was not the defendants' fault (nor the plaintiff's). Moreover, this is a fraud case, and fraud must be pleaded with particularity. Fed.R.Civ.P. 9(b). But a plaintiff cannot be faulted for failing to plead with particularity in his complaint a fraud that he first learns of, with all due diligence, in pretrial discovery. Cf. *Pridgen v. Farmer,* 567 F.Supp. 1457, 1460 (E.D.N.C.1983); *Denny v. Carey,* 72 F.R.D. 574, 578 (E.D.Pa.1976). Maybe, given the absence of a pretrial order, Ash should have moved to amend his complaint, in order to make meticulous compliance with Rule 9(b). But dismissal—the practical effect of the district judge's refusal to allow Ash to prove underbilling damages—was too harsh a sanction for a harmless error (if error it was). It was harmless because the defendants were not surprised, having known since discovery

that underbilling was the heart of Ash's case.

The "this is not a rate case" refrain that the defendants have been sounding since the underbillings came to light is unhelpful. Indeed this is not a rate case, because Ash is not seeking and could not possibly seek reparations under the Interstate Commerce Act for the pricing of common carrier shipments below the rates specified in a tariff. It is true that pricing below the tariffed rate is unlawful, see 49 U.S.C. § 10761(a), and that a motor common carrier can bring suit in federal district court against the shipper to recover the amount of the undercharge, with reference if necessary to the ICC to determine the lawfulness of the rate paid by the shipper. See §§ 11705(b)(3), 11706; *Western Transportation Co. v. Wilson & Co.*, 682 F.2d 1227, 1231–32 (7th Cir.1982); *National Industrial Transportation League—Petition to Institute Rulemaking*, 3 I.C.C.2d 99 (1986). But this presupposes that the carrier has filed a tariff—something Wallenmeyer on behalf of J & W was supposed to do but did not. Whether or not J & W might still have had a remedy under the Interstate Commerce Act, the ground on which Ash was seeking damages on J & W's behalf for the underbilling is distinct from any rights J & W might have under the Act. Ash's ground was that, had it not been for the fraud, Wallenmeyer would have filed tariffs for J & W on the carriage of Georgia–Pacific shipments from the Gary facility, and Georgia–Pacific would have paid the tariff rates (indeed it would have been legally obligated to do so). If Ash could prove this, he would be entitled to damages on each shipment equal to the difference between the tariffed rates and the actual rates paid, subject to the defendants' being able to persuade the trier of fact that, if Wallenmeyer had charged the tariffed rate, Georgia–Pacific would have bought less than it did, in which event the damages would be less than Ash contends. Whatever the precise amount, these damages would not be reparations under the Interstate Commerce Act; no reference to the ICC would be required; and it is doubtful that the ICC would, if asked, render an advisory opinion,

since it would relate to a hypothetical rather than an actual tariff. All this was well known to the defendants and their counsel, and they could not plead surprise as a ground for asking the judge to truncate Ash's case fatally.

This gratuitous procedural bobble might well have been avoided if there had been a pretrial order defining the issues for trial. Rule 16 of the Federal Rules of Civil Procedure does not require the preparation of such an order in every case, but most district judges believe that such an order is of great value in any case other than the simplest, and this was not the simplest. We asked the parties why no pretrial order had been prepared in this case and they replied that Judge Leinenweber does not enter a pretrial order in any case. If this is true, the course of the present case suggests that the judge may wish to reconsider his position, at least for cases of this complexity.

The defendants were well represented, and their counsel skillfully (and without exceeding the bounds of ethical advocacy, we hasten to add) confused the judge regarding the plaintiff's alleged change of theory. But litigation under the Federal Rules of Civil Procedure is not supposed to be merely a game, a joust, a contest; it is also a quest for truth and justice. If Ash's failure to obtain evidence of the major fraud against his company sooner had impeded the defendants' ability to prepare a defense at reasonable cost, then dismissal (the practical effect of the judge's ruling excluding damages for underbilling) might well have been a proper sanction. But it did not, and Ash was entitled to his day in court.

We agree with the defendants, however, that the district judge did not abuse his discretion in refusing to allow Ash to amend his complaint to add a claim under RICO against Georgia–Pacific. The only RICO section potentially relevant to the facts of this case is 18 U.S.C. § 1962(c), which makes it unlawful for a person employed or otherwise associated with an enterprise to conduct its affairs through a pattern of racketeering—an apt descrip-

tion, perhaps, of Iverson's and Adamczyk's activities in the underbilling scheme, but inapplicable to Georgia–Pacific. Georgia–Pacific could not be the person associated with the enterprise—it *was* the enterprise. *D & S Auto Parts, Inc. v. Schwartz*, 838 F.2d 964, 966–67 (7th Cir.1988).

The judgment of dismissal is reversed and the case is remanded for further proceedings consistent with this opinion. Circuit Rule 36 shall apply on remand. For the further guidance of the district court we point out that Ash has abandoned his claim for diversion damages, and therefore the further proceedings will be limited to the defendants' liability for, and the amount of, the underbilling damages.

REVERSED AND REMANDED, WITH DIRECTIONS.